FILED
CLERK
2:20 pm, Mar 26, 2019
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
GRACE INTERNATIONAL ASSEMBLY
OF GOD,

       Plaintiff,

  v.

GENNARO FESTA and FALCON GENERAL
CONSTRUCTION SERVICES, INC.,

       Defendants.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**
17-CV-7090 (SJF) (AKT)

FEUERSTEIN, District Judge:

  Plaintiff Grace International Assembly of God ("Plaintiff" or "Grace") commenced this case against defendants Gennaro Festa ("Festa") and Falcon General Construction Services, Inc. ("Falcon") (collectively, "Defendants") asserting claims against Festa pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, against Falcon for breach of contract and negligence under state law, and against both Defendants for fraud and breach of trust under state law. Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Motion, Docket Entry ("DE") [25]. Plaintiff opposes the motion. For the reasons set forth below, the motion is granted, and the case dismissed.

**I. BACKGROUND**

**A. Factual Background**

  The following facts are taken from the amended complaint ("Am. Compl."), DE [22], and are assumed to be true for purposes of this motion. In addition, various documents have been incorporated by reference in, and attached to, the amended complaint including: a contract dated May 19, 2014, (the "Contract"), DE [22-1], and; eleven (11) documents entitled "Application

and Certification for Payment" ("A&C"), numbered one (1) through eleven (11) and dated periodically from August 1, 2015 to August 19, 2016.  DE [22-2 & 22-3].

Grace is a New York religious corporation that maintains a place of worship at 172 Willis Avenue, Mineola, New York (the "Premises").  Am. Compl. ¶ 1.  Falcon, a general construction contractor, is a New York corporation, and Festa is the President and sole shareholder of Falcon. *Id.* ¶¶3-5.  Prior to 2014, the church located on the Premises consisted of two attached buildings: the sanctuary and a fellowship hall.  *Id.* ¶8.  In or about February 2014, Falcon agreed to act as general contractor on a project (the "Project") to: (1) refurbish the existing sanctuary, which was to become the fellowship hall; and (2) demolish the existing fellowship hall and build a new sanctuary in its place.  *Id.* ¶9.

On or about February 4, 2014, Festa met with Grace's governing Council and its minister, Pastor Wilson.  Am. Compl. ¶18.  During that meeting Festa represented that steel shop drawings ("Steel Shop Drawings") would be prepared by American Buildings Company ("ABC"), a Georgia company that would also provide prefabricated steel.  *Id.*  ¶18.  The Steel Shop Drawings would be ordered from ABC by American Building Services of New York, Inc. ("ABS"), an entity that the Amended Complaint refers to alternatively as either "an agent of Falcon's," *id.* ¶18(b), or "Festa's agent."  *Id.*  ¶¶20(a); 212(a).  There are no factual allegations to support this legal conclusion.  Plaintiff further alleges that ABC and ABS entered into an agreement, *id.* ¶20(a), but provides no specifics regarding the timing or scope of that agreement.

On or about May 14, 2014, Grace and Falcon entered into a written Contract for the Project.  *Id.* ¶10 & Ex. A.  The Contract provides for the scope of work including, labor and materials, for a contract amount of $900,000.  Contract, Ex. A.  Plaintiff alleges that over the course of the Project, Festa, on behalf of Falcon, made numerous fraudulent misrepresentations

which Grace organizes into eleven (11) categories. The alleged misrepresentations pertain to: (1) the Steel Shop Drawings, Am. Compl. ¶¶18-27; (2) Steel Building Frame, *id.* ¶¶ 28-46; (3) Steel for First Floor Framing, *id.* ¶¶47-55; (4) Steel for Mezzanine Framing, *id.* ¶¶56-60; (5) Sewer Pump, *id.* ¶¶61-68; (6) Plumbing Fixtures, *id.* ¶¶69-80; (7) Electric Utility Room, *id.* ¶¶81-92; (8) Drywall Trim and Hardware, *id.* ¶¶93-98; (9) Finishes, Paint, and Ceramic Tile, *id.* ¶¶99-104; (10) Electric Fan Outlets, *id.* ¶¶105-10; and (11) "General Conditions: Insurance, Labor." *Id.* ¶¶111-54.

Regarding the Steel Shop Drawings, Festa, having told the Council that ABC required payment in advance, invoiced Grace for $24,500, which Grace paid on February 27, 2014. Am. Compl. ¶¶18(d)(e), 23. In 2017, Grace learned that no advance payment was required, that Festa knew no advance payment was required, and that ABC had received only $6,000.00. *Id.* ¶20. Grace alleges that the balance of the amount ostensibly paid for the Steel Shop Drawings was not used on the Project. *Id.* ¶24.

The alleged misrepresentations regarding the Steel Building Frame include that Festa attended at least four meetings with members of the Council in April and May 2014 during which he made oral representations that Grace must make an initial payment of $116,760 to be used to purchase building frame steel from ABC. Am. Compl. ¶28. Festa submitted an invoice to Grace for $116,760, which Grace paid by check dated May 29, 2014. *Id.* ¶¶29, 31. Grace alleges that Festa had no intention of using these monies to purchase steel. *Id.* ¶30. During eight (8) meetings held between June 3, 2014 and August 2, 2016, Festa represented to Grace Council members and Pastor Wilson that the monies had been paid to ABC "and that the steel for which it was to be used had been ordered, secured, and stored somewhere." *Id.* ¶32. The same representation was made in multiple meetings from January 2017 through March 2017. *Id.* ¶33.

3

The Building Frame Steel was never delivered, stored or installed at the Premises, and Plaintiff alleges, upon information and belief, that the steel was never purchased "from ABC or anyone else." *Id.* ¶35.

Detailed recitation of the allegations regarding the nine remaining categories of alleged misrepresentations is unnecessary to resolve the motion before the Court. Suffice it to say that for each category, Grace alleges that Festa, on behalf of Falcon, made misrepresentations, either verbally or through submission of the A&Cs, regarding the purchase of materials and/or the progress of the construction, and that Grace relied on those misrepresentations and continued to make payments. From August 1, 2015 to August 19, 2016, Falcon submitted eleven (11) separate A&Cs to Grace requesting payments totaling $359,950. Am. Compl. Ex. A. In addition, the Amended Complaint contains allegations regarding other invoices submitted by Falcon and paid by Grace. *See, e.g.,* Am. Compl. ¶19 (invoice 211001 for $24,500); ¶29 (invoice 2 for $116,760); ¶61 (invoice 6 for $6,200); ¶62 (invoice 12 for $1,200).

Falcon also subcontracted out work on the Project to various subcontractors including Amano Contracting, Inc. ("Amano), which was to perform demolition of the existing fellowship hall, removal of fill and debris, and excavation of the foundation for the new sanctuary. Am. Compl. ¶155. Grace alleges that Amano fully performed under the subcontract, but Falcon did not pay it any of the $74,000 owed for that work. *Id.* ¶156. On June 16, 2016, Amano filed a notice of lien against the Premises. *Id.* ¶157. Falcon ceased performing work on the Premises in July 2016 and "effectively abandoned the Project." *Id.* ¶158. In late August 2016, Grace was advised about the notice of lien by Heritage Investment Services Fund ("Heritage"), a lender that

4

had been providing funds to Grace to finance the Project. *Id.* ¶159.[1] Heritage ceased lending money to Grace for the Project in late August 2016. *Id.* ¶160. Grace terminated Falcon as general contractor on the Project on or about April 26, 2017 "after investigating the facts so as to uncover Festa and Falcon's fraud." *Id.* ¶161. Plaintiff alleges that at the time of its termination, Falcon had completed only 38.5% of the Project. *Id.* ¶164.

## B. RICO Allegations

Plaintiff alleges that Defendants perpetrated two interrelated fraudulent schemes, which it has named the "Project Invoicing Fraud Scheme" and the "Subcontractor Nonpayment Fraud Scheme." In the Project Invoicing Fraud Scheme, Defendants "defraud[ed] Grace into paying for aspects of the Project, including the purchase of materials, that either were not performed or purchased at all or had been performed or purchased only in part." Am. Compl. ¶11. According to Plaintiff, the alleged victims of this scheme include Grace, the institution lending Grace money for the Project, and the subcontractors and materialmen retained by Falcon. *Id.*

The Subcontractor Nonpayment Fraud Scheme relates to Falcon's alleged nonpayment or partial payment to subcontractors or materialmen for labor or materials while misrepresenting to Grace that those subcontractors and materialmen had been paid in full. Am. Compl. ¶12. Grace acknowledges that it "is not claiming injury from the Subcontractor Nonpayment Fraud Scheme" but is including these allegations "simply to demonstrate additional victims of Festa's misconduct, and additional facts concerning Festa's pattern of racketeering activity." *Id.* Grace contends that Falcon sought monies from Grace to pay certain subcontractors, Grace made those payments to Falcon, and Falcon failed to pay the subcontractors. In addition to failing to pay its

---

[1] Although this paragraph alleges that Heritage had been providing funds to Falcon, Plaintiff notes in its Memorandum of Law that this is a mistake and that Heritage was Grace's lender. Pl. Mem. of Law at 18, n.5.

subcontractor Amano, Plaintiff alleges that Falcon paid Ace-Tec Enterprises, Inc. ("Ace-Tec") only $30,000 of the $79,000 it is owed, *see id.* ¶¶180-88, did not pay Liberty Pipe, Inc. ("Liberty") $3,000 it is owed. *Id.* ¶¶190-99.

Grace alleges that Falcon is a RICO enterprise, and that it has engaged in activities affecting interstate commerce such as its purchase of: (a) the steel shop drawings from ABC, a Georgia corporation, through ABS; (b) steel from Ace-Tec, which was originally shipped from Pennsylvania and/or North Carolina; (c) materials and services from ABS, located in New Jersey; (d) materials from Home Depot and Staples, national chain stores. Am. Compl. ¶206.

Regarding the Project Invoicing Scheme, Grace identifies thirteen (13) predicate acts of wire fraud as defined by 18 U.S.C. §1343 including that Festa caused the Steel Shop Drawings to be sent by e-mail from ABC in Georgia to ABS in New York on or about March 22, 2014 (the "First Predicate Act"). Am. Compl. ¶¶211-12. Festa knew, or it was reasonably foreseeable, that the drawings would be transmitted electronically.

Grace further enumerates twelve (12) wire transfers of monies that Festa "caused to be sent":

- From Grace in New York to AG Financial, an umbrella company holding monies for Grace located in Missouri—three (3) written requests by facsimile requesting the wire transfer of funds into Grace's checking account in New York;

- From AG Financial in Missouri to Grace in New York—three (3) wire transfers of the monies corresponding to Grace's requests as referenced in the preceding paragraph;

- From Grace in New York to Heritage, a lending institution in Pennsylvania—three (3) written requests transmitted by facsimile requesting the wire transfer of funds to Grace's checking account in New York;

6

- From Heritage in Pennsylvania to Grace in New York—three (3) wire transfers of monies corresponding to Grace's requests as referenced in the preceding paragraph.

Am. Compl. ¶¶214-15. Festa caused these uses of the interstate wires "in that he knew, or it was reasonably foreseeable, that such uses would occur in the ordinary course of business." *Id.* ¶216. The first of these transmissions took place on or about May 7, 2015, and the last on or about August 23, 2016.

Regarding the Subcontractor Nonpayment Fraud Scheme, Grace identifies predicate acts of money laundering and misappropriation of trust funds, alleging that the monies Grace paid to Falcon which were to be paid to the latter's subcontractors and materialmen constituted "trust funds within the meaning of Article 3-A of the Lien Law" in New York, Am. Compl. ¶223, and that Falcon's failure to pay trust claims by its subcontractors violates New York state law and constitutes grand larceny pursuant to New York Penal Law §155.30. Grace claims that the predicate acts constitute a pattern of racketeering related to the same Project.

**C. Procedural History**

Plaintiff filed the complaint on December 5, 2017 alleging federal question jurisdiction based on the RICO claim. The Clerk's Office issued a notice of entry of default on January 25, 2018, noting Defendants' failure to appear. Defendants moved to vacate the Clerk's entry of default shortly thereafter, and that motion was granted on April 10, 2018. Plaintiff filed its amended complaint on May 23, 2018, and Defendants filed the current motion to dismiss, arguing that the amended complaint fails to state a civil RICO claim.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

Defendant seeks dismissal of the action pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  The standards for analyzing a motion to dismiss are well-established.  The court must accept the factual allegations in the complaints as true and draw all reasonable inferences in favor of the plaintiff.  *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (citations omitted).  The court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal,* 556 U.S at 678 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

The determination of "whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal,* 556 U.S at 679.   A pleading that does nothing more than recite bare legal conclusions, however, is insufficient to "unlock the doors of discovery."  *Iqbal*, 556 U.S. at 678-679; *see also Twombly,* 550 U.S. at 555 (holding that a "formulaic recitation "formulaic recitation of cause of action's elements will not do.   Factual allegations must be enough to raise a right to relief above the speculative level.").  While Rule 8 does not require "detailed factual allegations," it does require more than an "unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (citing *Twombly,* 550 U.S. at 555).

## B. Civil RICO Claims

"RICO's private right of action is contained in 18 U.S.C. § 1964(c)," *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 647, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008), which provides that, with an exception not relevant here, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c). The amended complaint alleges that Festa violated §1962(c) of RICO, which provides in pertinent part that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c).

To state a claim under §1962(c), a plaintiff must allege: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly ... participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983). A plaintiff alleging a RICO claim "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985). A plaintiff must plead, at a minimum, "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys.*, Inc., 271 F.3d 374, 380 (2d Cir. 2001).

Racketeering activity "is defined to include a host of so-called predicate acts," *Bridge,* 553 U.S. at 647, including "any act which is indictable under . . . section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(a).[2] A "pattern" of racketeering activity requires a showing of at least two predicate acts of racketeering within ten years of one another. 18 U.S.C. §1961(5).

Where a plaintiff alleges racketeering activity based on mail or wire fraud, it "must prove three elements: (1) scheme to defraud, including proof of intent; (2) money or property as object of [the] scheme; (3) use of mails or wires to further the scheme." *K&D Corp. v. Concierge Auctions, LLC,* 2 F. Supp. 3d 525, 539 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). However, "[g]iven the routine use of mail and wire communications in business operations, . . . 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)); *see also Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 575–76 (S.D.N.Y. 2016) (noting that "predicate acts of mail and wire fraud merit particular scrutiny . . . lest the courts allow the RICO statute 'to federalize garden-variety state common law claims" (internal quotation marks and citations omitted)); *Gross v. Waywell,* 628 F. Supp. 2d 475, 493 (S.D.N.Y. 2009) (observing that "virtually every ordinary fraud is carried out in some form by means of mail or wire communication").

---

[2]Wire fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice...." 18 U.S.C. § 1343.

In addition, where the predicate acts sound in fraud, including wire fraud, the complaint must also satisfy the provision in Rule 9(b) that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake [must] be stated with particularity." FED. R. CIV. P. 9(b). To comply with Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks and citation omitted).

Defendants claim that the Amended Complaint fails to state a claim for in that it fails to plausibly allege: (1) an enterprise; (2) a pattern of racketeering; and (3) proximate causation.

## III. DISCUSSION

### A. RICO

#### 1. Enterprise

"[T]o establish liability under §1962(c), one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to be a different name." *Cedric Kushner Promotions, Ltd., v. King,* 533 U.S. 158, 161, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001). Defendants argue that Falcon, a corporate entity, and its President, Festa, are not adequately distinct and cannot be both the "enterprise" and the "person" necessary for RICO liability. Addressing a similar factual scenario, the Supreme Court found that "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Cedric Kushner,* 533 U.S. at 163. Thus, where an employee "conducts the affairs of a corporation through illegal acts," that employee may be the RICO "person" separate and apart from the corporation and "the employee and the corporation are different 'persons,' even where

11

the employee is the corporation's sole owner." *Id.* Applying this precedent to the current case, the Amended Complaint sufficiently alleges that Festa is the "person" and Falcon is the "enterprise."

2. Pattern of Racketeering

"To satisfy the "pattern" requirement, the factual allegations must meet two standards: relatedness and continuity. The pleadings must show that the predicate acts asserted are related and amount to or pose a threat of continuing criminal activity." *Gross*, 628 F. Supp. 2d at 485. "[T]hese two constituents of RICO's pattern requirement must be stated separately though in practice, their proof will often overlap." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989).

a. Relatedness

"Predicate acts are 'related' for RICO purposes, when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 97 (2d Cir 1997) (quoting *H.J. Inc.,* 492 U.S. at 240). "A relationship to show the existence of a pattern is indicated by temporal proximity of the acts, by common goal, methodology, and their repetition." *Cosmos Forms Ltd. v. Guardian Life Ins. Co.,* 113 F.3d 308, 310 (2d Cir. 1997).

Twelve of the thirteen alleged predicate acts consist of six pairs of transactions – Grace's request for funds from a financial institution followed by that institution's forwarding of the requested funds – that occurred from May 7, 2015 to August 23, 2016. The acts are repeated and have the common goal of funding the Project, funding which Plaintiff claims was wrongfully

diverted by Defendants. For the purposes of withstanding a motion to dismiss, the amended complaint adequately alleges the relatedness of these twelve acts.

The First Predicate Act, transmission of the Steel Shop Drawings on or about March 22, 2014, is more isolated and not clearly intertwined with the subsequent acts. It occurs at the very beginning of the alleged scheme and is temporally removed from the other acts, occurring over a year before the next act. The methodology of this act is also distinct as it concerns a transmission between ABC, an entity unrelated to any party in this litigation, to ABS. ABS is summarily alleged to be the purported "agent" of Festa and/or Falcon, but there are no allegations to support the legal conclusion that ABS was acting as an agent. The nature of the First Predicate Act is also different in that it involves the transmission of technical materials and is not directly related to crux of the scheme -- the transfer of funds. Plaintiff argues that the transmission of the Steel Shop Drawings was essential to the overall scheme since the Project could not have progressed without them, implying that the First Predicate Act was in furtherance of the common goal. Drawing all inferences in Plaintiff's favor, the Amended Complaint plausibly alleges that the predicate acts are related. Relatedness of the predicate acts, however, "is not alone enough to satisfy §1962's pattern element." *H.J. Inc.,* 492 U.S. at 240.

      b. *Continuity*

As to continuity, a "plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004) (internal quotation marks and citation omitted). Grace claims that it has plausibly alleged both types of continuity.

Closed ended continuity is demonstrated "over a closed period by proving a series of related predicates over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242. The length of the time period is significant, as the Second Circuit "has never held a period of less than two years to constitute a 'substantial period of time'" for purposes of establishing closed-ended continuity. *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001) (citing cases); *see generally H.J. Inc.,* 492 U.S. at 242 (noting that given Congress's concern in RICO with long-term criminal conduct, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct" do not satisfy the pattern requirement). Including all the alleged predicate acts, the scheme encompassed only twenty-nine months; excluding the First Predicate Act, the time period is less than eighteen months.

The duration of the scheme is not the only consideration, however, because while "closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *DeFalco*, 244 F.3d at 321. "Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity." *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 372 (E.D.N.Y. 2002); *see also Flexborrow LLC v. TD Auto Fin. LLC,* 255 F. Supp. 3d 406, 420 (E.D.N.Y. 2017); *Ray Larsen Assocs., Inc. v. Nikko Am., Inc.*, No. 89 CIV. 2809, 1996 WL 442799, at *8 (S.D.N.Y. Aug. 6, 1996). Here, the scheme involved only two participants (Festa and his company, Falcon), affected a small number of victims (Grace),[3] and

---

[3]Plaintiff urges the inclusion of three subcontractors, victims of the Subcontractor Nonpayment Scheme, as part of this number. As will be discussed *infra,* this alleged scheme is not well-pled. The inclusion of these entities as victims, however, still leads to a relatively small number of victims.

was limited in scope because it had one goal – defrauding Grace of monies meant to be used in the Project. Thus, even if the temporal component has been satisfied, Plaintiff still would not have established closed-ended continuity. *See Bernstein v. Misk,* 948 F. Supp. 228, 238 (E.D.N.Y. 1997) (finding no closed-ended continuity where acts took place over four and one half years, but the criminal activity alleged "involved only one major perpetrator who focused his activity on one group of purchasers in a single, non-complex scheme to obtain financing for a purchase of property and then default on the loan").

Plaintiff also argues that it has established open-ended continuity by showing "past criminal conduct coupled with a threat of future criminal conduct." *GICC Capital Corp. v. Tech. Fin. Grp., Inc.,* 67 F.3d 463, 466 (2d Cir. 1995). "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir. 1999). "Where an inherently unlawful act is performed at the behest of an enterprise whose business is racketeering activity, there is a threat of continued criminal activity, and thus open-ended continuity." *DeFalco*, 244 F.3d at 323. However, where the enterprise conducts primarily legitimate business, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit,* 187 F.3d at 243.

Plaintiff has not plausibly alleged that Defendants' conduct poses an indefinite threat of continued criminal activity. The alleged Project Invoicing Fraud Scheme arises from a discrete, finite construction project. Plaintiff argues that given the pace of work on the Project up to the date Falcon ceased working, it calculates that the Project would have taken an additional

15

seventy-five (75) months to complete. Am. Compl. ¶243. Disregarding the sheer conjecture of this argument, the length of time required does not change the fact that the Project itself was inherently terminable.[4]

Furthermore, Plaintiff has not demonstrated open-ended continuity by plausibly alleging that the predicate acts were part of Falcon's regular way of doing business. It fails to allege how Falcon, a primarily legitimate business, regularly operates in an allegedly illegal manner as to any client other than Grace.

Assuming *arguendo* that Plaintiff had plausibly alleged that Falcon regularly defrauded its clients, the implied threat of continued criminal activity theory "only applies to "'inherently unlawful' criminal activities in pursuit of 'inherently unlawful' goals, such as murder, obstruction of justice, narcotics trafficking, embezzlement, extortion, bribery, and money laundering." *Albunio v. Int'l Safety Grp.,* 15-CV-152, 2016 WL 1267795, at *7 (S.D.N.Y. Mar. 30, 2016); *see also United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) (the threat of continuity is established "where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement" but "in cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, the courts generally have found no threat of continuing criminal activity"). Ordinary fraud supported by wire fraud predicates are not "inherently unlawful" for purposes of RICO continuity. *See, e.g., Aulicino*, 44 F.3d at 1111("in cases concerning alleged

---

[4]This is not to suggest that a construction project can never be the basis for a civil RICO claim. *See generally Procter & Gamble Co. v. Big Apple Indus. Bldgs, Inc.,* 879 F.2d 10 (2d Cir. 1989). In the current case, however, given the limited scope of the alleged scheme, the lack of allegations regarding criminal conduct beyond this Project, and the other factors discussed, the fact of the Project's discreteness further supports a finding that there is no viable RICO claim.

racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, the courts generally have found no threat of continuing criminal activity"); *Albunio,* 2016 WL 1267795, at * 7 ("ordinary fraud is not considered 'inherently unlawful'")*; Int'l Bhd. of Teamsters v. Carey*, 297 F. Supp. 2d 706, 715 (S.D.N.Y. 2004) (noting that "fraud (the object of which is by definition to obtain money or property from others) has been held not to be 'inherently unlawful' in the RICO continuity context"), *aff'd sub nom. Int'l Bhd. of Teamsters v. Blitz*, 124 F. App'x 41 (2d Cir. 2005); *In re Basic Food Grp., LLC*, No. 15-10892, 2016 WL 3677673, at *11 (Bankr. S.D.N.Y. July 1, 2016) ("[m]ail fraud and wire fraud are not 'inherently unlawful'"). Plaintiff does not claim that acts in addition to wire fraud would occur, but rather alleges that "similar predicate acts could continue to occur as long as work on the Project continued." Am. Compl. ¶242. As these predicate acts were simply fraud, they are not inherently unlawful for purposes of the continuity analysis.

Plaintiff tries to enhance its allegations by pointing to the secondary Subcontractor Nonpayment Scheme in an attempt to make Defendants' actions appear more complex and to add to the "victim" count by including three subcontractors. *See* Am. Compl. ¶165 (Grace asserts that it does not seek damages for racketeering resulting from the Subcontractor Nonpayment Scheme, but rather puts it forth "to provide further evidence of Festa's participation in Falcon through a pattern of racketeering activity and the existence of additional victims"). As a threshold matter, the scope of the Subcontractor Nonpayment Scheme is not alleged with any specificity. The Amended Complaint identifies only three subcontractors who were victims without stating that there were, or were not, others at work on the Project. Thus, it is unclear whether this purported scheme was employed uniformly against all of Falcon's subcontractors or rather was carried out selectively against the three entities identified.

17

The allegations concerning the three subcontractors identified are also conclusory and lack factual support. As to each of three subcontractors, Amano, Ace-Tec, and Liberty, the allegations follow the same formula.[5] First, Grace claims there was a subcontract with Falcon. *See, e.g.,* Am. Compl. ¶180 (Grace alleges that Falcon had subcontracted work to Ace-Tec, defining the "agreement" as the "Ace-Tec Project Subcontract"). None of the purported subcontracts is provided with the Amended Complaint. Without reference to any provision in the alleged subcontract in question or any other source of its information, Grace alleges that each subcontractor was to perform specific acts or provide specific materials. Grace then points to an A&C submitted for payment by Falcon, and identifies acts or materials on the A&C that it claims were, in fact, performed or provided by a subcontractor. *See, e.g., id.* ¶ 182 (citing A&C No. 10, Grace claims that work performed under the categories "steel for first floor framing" and Steel for Mezzanine framing" was done by Ace-Tec pursuant to the subcontract). The name of the purported subcontractor, however, does not appear on any of the A&Cs. Finally, Grace summarily concludes that although it paid the amount specified on the A&C to Falcon, the subcontractor remained unpaid. *See, e.g., id.* ¶¶185-89 (Grace paid Falcon for the work in the A&C, Ace-Tec was not paid in full, there Ace-Tec "was a victim of the Subcontract Nonpayment Scheme.").

This thinly pled scheme does not provide support to Plaintiff's claim that Defendants were involved in racketeering activity. Simply put, Grace's allegations throughout the Amended Complaint, which may state law fraud or contract violations, do not constitute the type of long-term, criminal conduct meant to be remedied by RICO.

---

[5] For the sake of brevity, an example from only one of the subcontractors, Ace-Tec, is provided here for illustration.

### B. Remaining State Law Claims

The remaining claims asserted by Plaintiff — breach of contract, negligence, fraud and breach of trust — all arise under state law. A court may decline to exercise supplemental jurisdiction over state law claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367 (c)(3). The decision whether to exercise supplemental jurisdiction is discretionary. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018). In making this determination, the court "must still meaningfully balance the supplemental jurisdiction factors." *Id.* However, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine–judicial economy, convenience, fairness, and comity–will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349-50, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)).

Upon consideration of all relevant factors, this Court declines to exercise supplemental jurisdiction over the remaining claims. Accordingly, any state law claims asserted by plaintiff are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, DE [25] is granted and the case dismissed.

**SO ORDERED**.

        /s/
Sandra J. Feuerstein
United States District Judge

Dated: March 26, 2019
      Central Islip, New York